UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, the STATE OF CALIFORNIA, the STATE OF NEW JERSEY and the STATE OF NEW YORK, | Civil Action No._____ |
| *ex rel.* [UNDER SEAL], | |
| Plaintiffs, | **MATTER FILED IN CAMERA AND UNDER SEAL** |
| vs. | |
| [UNDER SEAL], | |
| Defendants. | |

William L. Hurlock, Esq.
MUELLER LAW LLC
363 Bloomfield Avenue
Suite 2-C
Montclair, New Jersey 07042
(973) 233-8290

*Local Counsel for Plaintiff-Relator*

{H0268483.1}

1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, STATES OF NEW JERSEY, NEW YORK and CALIFORNIA, *ex rel.*, RICHARD CHESBROUGH, M.D. | Civil Action No._____ |
| Plaintiff-Relator, | |
| -vs- | **MATTER FILED IN CAMERA AND UNDER SEAL** |
| MOBILE DIAGNOSTIC TESTING OF NJ, LLC, a New Jersey limited license company, H & D SONOGRAPHY, a New Jersey corporation, MOBILE DIAGNOSTIC TESTING OF NY, INC., a foreign corporation, MOBILE DIAGNOSTIC TESTING OF PA, INC., a foreign corporation, MOBILE DIAGNOSTIC TESTING OF CA, INC, a foreign corporation, ALPHA SCAN IMAGING, LLC, a New Jersey limited license company, VIJAY PATEL, DIPEN V. PATEL, HIMESH V. PATEL, ALKA V. PATEL, MEDHAT RAOUF, M.D., ARUNA RAO, M.D., BHARAT DASSANI, M.D., DOUGLAS BIENSTOCK, D.O., MICHAEL KRICKO, M.D., SUDHA RANI KOLLI, M.D., TASNEEM RASHID, M.D., TIMOTHY BRABSTON, M.D., VALLUR THIRUMAVALAVAN, M.D., DR. VINCENT ADRIAN CODELLA, D.O., DEBRA GAIL REICH-SOBEL, D.O., DR. ROLAND LOSOS, M.D. DR. MUSTAFA M. SIDALI, D.O.THOMAS J. STACK, D.O., DR. NANCY LENTINE, D.O., DR. KOENIGSBERG, DR. SCHULMAN, DR. KALRA, and DR. GREENSPAN, Jointly and Severally, | |
| Defendants. | |

_____ /

HERTZ SCHRAM PC
By: Patricia A. Stamler (P35905)
*Attorney for Relator Chesbrough*
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302
(248) 335-5000

WARREN | BENSON LAW GROUP
By: Donald R. Warren (138933)
*Co-Counsel for Relator Chesbrough*
7825 Fay Avenue, Suite 200
La Jolla, CA 92037
(858) 454-2877

MUELLER LAW LLC
By: William Hurlock (002561999)
*Local Counsel for Relator Chesbrough*
363 Bloomfield Avenue, Suite 2-C
Montclair, NJ 07042
(973) 233-8290

/

## SEALED COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT (QUI TAM), THE FRAUD ENFORCEMENT RECOVERY ACT OF 2009 ("FERA"), 31 U.S.C. §§ 3729-3733ANTI-KICKBACK STATUTE, CIVIL MONETARY PENALTIES 1320a-7a, THE STARK ACT, 42 U.S.C. §1395nn et seq. , the NEW JERSEY FALSE CLAIMS ACT, N.J. Stat. § 2A:32C-1, et seq. , the NEW YORK FALSE CLAIMS ACT, N.Y. Stat. § 189 et seq., and the CALIFORNIA FALSE CLAIMS ACT, Cal. Gov't Code § 12651(a) et seq. AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff-Relator Richard Chesbrough, M.D. (hereafter

"Relator"), for himself and on behalf of the United States of America and the States of

New Jersey, New York and California (hereafter "States"), by and through his

attorneys, HERTZ SCHRAM PC, WARREN | BENSON LAW GROUP and

MUELLER LAW LLC and hereby files his Complaint under the False Claims Act

("FCA"), 31 U.S.C. § 3729, *et seq*., the Fraud Enforcement Recovery Act of 2009

("FERA"), 31 U.S.C. §§ 3729-3733,the Anti-kickback Statute, *see* 42 U.S.C. §§

1320a-7(b)(7) and 1320a-7b(b), the Civil Monetary Penalties Law, 42 U.S.C. §§

{H0268483.1}                                                  3

1320a-7(b)(7) and 1320a-7a, the Stark Act, 42 U.S.C. §1395nn *et seq.* , the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1, *et seq* , the New York False Claims Act, N.Y. Stat. § 189 *et seq*., and the California False Claims Act, Cal. Gov't Code § 12651(a) *et seq*. and states as follows:

## JURISDICTION AND VENUE

1. This action arises under 31 U.S.C. § 3729 et seq., the False Claims Act ("FCA"); 31 U.S.C. §§ 3729-3733, the Fraud Enforcement Recovery Act of 2009 ("FERA"); 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7b, the Anti-kickback Statute, *see* 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7b(b), the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, the Stark Act, 42 U.S.C. §1395nn *et seq.* , the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1, *et seq.* , the New York False Claims Act, N.Y. Stat. § 189 *et seq*. and the California False Claims Act, Cal. Gov't Code § 12651(a) *et seq*. (hereafter "Acts"), to recover treble damages and civil penalties on behalf of the United States of America and the States of New Jersey, New York and California (hereafter "States") arising out of the Defendants' submission of false claims to the United States and the States' governments through the federal health care programs, including Medicare and Medicaid.

2. 31 U.S.C. § 3732 provides that this Court has exclusive jurisdiction over actions brought under the federal False Claims Act and concurrent jurisdiction over state claims arising from the transactions giving rise to the claims under such Act. In

addition, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1345 and 28 U.S.C. § 1331 because this civil action arises under the laws of the United States. Further, this Court has jurisdiction under 31 U.S.C. § 3732(b) or any action brought under the laws of any state for the recovery of funds paid by state or local government if the action arises from the same transaction or occurrence as an action brought under § 3732.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 3732(a) of the Act which provides that "any action under 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act prescribed by § 3729 occurred." The acts which are the subject of this action occurred in multiple states including, but not limited to, the City of Parsippany in the State of New Jersey, within this judicial district.

4.      Under the False Claims Act, this Complaint is to be filed *in-camera* and remain under seal for a period of at least 60 days and under the State Acts for New Jersey, New York and California, this Complaint is to be filed *in-camera* and remain under seal for a period of at least 60 days. The federal government may elect to intervene and proceed with the action within 60 days after it receives both the Complaint and the material evidence and the States of New Jersey, New York and California's

governments may elect to intervene and proceed with the action within 60 days after they receive both the Complaint and the material evidence.

5.      As required under § 3730(a)(2) of the FCA, Relator has provided to the Attorney General of the United States, prior to the filing of this Complaint, statements of all material evidence and information related to the Complaint.  Relator has also provided the Attorney Generals of the States of New Jersey, New York and California a copy of his evidentiary disclosure.

6.      Relator is the original source of the information of the allegations contained in this Complaint.

7.      This is also an action to recover damages, civil penalties, and exclusion from all federal health care programs pursuant to 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7b(b), which provisions are commonly known as the Anti-Kickback Statute.

8.      This action also seeks to obtain damages, assessments, civil monetary penalties, and exclusion from all federal health care programs pursuant to 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, which provisions are known as the Civil Monetary Penalties Law ("CMPL").

9.      This is also an action to recover damages arising out of the violation of the Stark Act, 42 U.S.C. §1395nn *et seq*.

## PARTIES

10.     Relator Richard Chesbrough, M.D., is for all times relevant to this Complaint a resident of the State of Michigan.

11.     Defendant MOBILE DIAGNOSTIC TESTING OF NJ, LLC (hereafter "MDT NJ"), is for all times relevant to this Complaint a New Jersey limited license company, with its headquarters located at 60 Baldwin Road, Parsippany, New Jersey.

12.     Defendant H & D SONOGRAPHY (hereafter "H & D"), is for all times relevant to this Complaint a New Jersey corporation, with its headquarters located at 60 Baldwin Road, Parsippany, New Jersey.

13.     Defendant MOBILE DIAGNOSTIC TESTING OF NY, INC. (hereafter "MDT NY"), is for all times relevant to this Complaint a foreign corporation located at 251 East 5th Street, Brooklyn, New York.

14.     Defendant MOBILE DIAGNOSTIC TESTING OF PA, INC. (hereafter "MDT PA"), is for all times relevant to this Complaint a foreign corporation located at 920 Madison Avenue, Suite 2, Audubon, Pennsylvania.

15.     Defendant MOBILE DIAGNOSTIC TESTING OF CA, INC. (hereafter "MDT CA"), is for all times relevant to this Complaint a foreign corporation located at 42820 Albrae Street, Fremont, California.

16.     Defendant ALPHA SCAN IMAGING, LLC (hereafter "ALPHA SCAN"), is for all times relevant to this Complaint a New Jersey limited license company with its headquarters at 60 Skyline Drive, Ringwood, NJ, 07456-2039.

17.     Defendant VIJAY PATEL is for all times relevant to this Complaint the owner of Defendants MDT NJ, MDT NY, MDT CA and MDT PA and was and is the President of MDT NJ and is a resident of New Jersey.

18.     Defendant DIPEN PATEL is for all times relevant to this Complaint an employee of MDT NJ and is a resident of New Jersey.

19.     Defendant HIMESH PATEL is for all times relevant to this Complaint an employee of MDT NJ and is a resident of New Jersey.

20.     Defendant ALKA V. PATEL is for all times relevant to this Complaint an employee of MDT NJ and is a resident of New Jersey.

21.     Defendant MEDHAT RAOUF, M.D. (hereafter "RAOUF"), is for all times relevant to this Complaint board certified in internal medicine and licensed to practice medicine in New Jersey, with an NPI of 1740444686.

22.     Defendant ARUNA RAO, M.D. (hereafter "RAO"), is for all times relevant to this Complaint a geriatrician, licensed to practice medicine in New Jersey with an NPI of 1508821489.

23.     Defendant BHARAT DASSANI, M.D. (hereafter "DASSANI"), is for all times relevant to this Complaint a gastroenterologist, located at First GI Endoscopy

and Surgery Center, LLC, and licensed to practice medicine in New Jersey with an NPI
of 1346508520.

24.     Defendant DOUGLAS BIENSTOCK, M.D. (hereafter "BIENSTOCK"),
is for all times relevant to this Complaint a doctor of osteopathic medicine licensed to
practice medicine in New Jersey with an NPI of 1831151356.

25.     Defendant MICHAEL KRICKO, M.D. (hereafter "KRICKO"), is for all
times relevant to this Complaint a medical doctor, licensed to practice medicine in New
Jersey with an NPI of 1215029905.

26.     Defendant SUDHA RANI KOLLI, M.D. ( hereafter "KOLLI"), is for all
times relevant to this Complaint a medical doctor, licensed to practice medicine in New
Jersey with an NPI of 1174623508.

27.      Defendant TASNEEM RASHID, M.D. (hereafter "RASHID"), is for all
times relevant to this Complaint a medical doctor, licensed to practice medicine in New
Jersey with an NPI of 1205947926.

28.     Defendant TIMOTHY BRABSTON, M.D. (hereafter "BRABSTON"), is
for all times relevant to this Complaint a medical doctor, licensed to practice medicine
in New Jersey with an NPI of 1184607863.

29.     Defendant  VALLUR  THIRUMAVALAVAN,  M.D.  (hereafter
"THIRUMAVALAVAN"), is for all times relevant to this Complaint a medical doctor,
licensed to practice medicine in New Jersey with an NPI of 1346283009.

{H0268483.1}                            9

30. Defendant VINCENT ADRIAN CODELLA, D.O. (hereafter "CODELLA"), is for all times relevant to this Complaint an osteopathic doctor, licensed to practice medicine in New Jersey with an NPI of 1134111248.

31. Defendant DEBRA GAIL REICH-SOBEL, D.O. (hereafter "REICH-SOBEL"), is for all times relevant to this Complaint an osteopathic doctor, licensed to practice medicine in New Jersey with an NPI of 1437254463.

32. Defendant ROLAND LOSOS, M.D. (hereafter "LOSOS"), is for all times relevant to this Complaint a medical doctor, licensed to practice medicine in New Jersey with an NPI of 1124282033.

33. Defendant MUSTAFA M. SIDALI, D.O. (hereafter "SIDALI"), is for all times relevant to this Complaint an osteopathic doctor, licensed to practice medicine in New Jersey with an NPI of 1811982762.

34. Defendant THOMAS J. STACK, D.O. (hereafter "STACK"), is for all times relevant to this Complaint an osteopathic doctor, licensed to practice medicine in New Jersey with an NPI of 1811205024.

35. Defendant NANCY LENTINE, D.O. (hereafter "LENTINE"), is for all times relevant to this Complaint an osteopathic doctor, licensed to practice medicine in New Jersey with an NPI of 1699869909.

36. Defendant DR. KOENIGSBERG (hereafter "KOENIGSBERG"), is for all times relevant to this Complaint a physician practicing medicine in New Jersey.

37.     Defendant DR. SCHULMAN (hereafter "SCHULMAN"), is for all times relevant to this Complaint a physician practicing medicine in New Jersey.

38.     Defendant DR. KALRA (hereafter "KALRA"), is for all times relevant to this Complaint a physician practicing medicine in New Jersey.

39.     Defendant DR. GREENSPAN (hereafter "GREENSPAN"), is for all times relevant to this Complaint a physician practicing medicine in New Jersey.

## GENERAL ALLEGATIONS

40.     **Overview of Violations**.   The Defendants engaged in at least four schemes to submit false claims for payment to the Medicare and Medicaid programs:

**First**, the Defendants engaged in an **illegal referral kickback scheme** involving above market "rental" payments paid to referring physicians to induce the ordering of imaging studies.

**Second**, the Defendants engaged in the **illegal corporate practice of medicine** in violation of New Jersey and New York laws.

**Third**, the Defendants performed imaging studies **without the requisite direct supervision necessary** for reimbursement by Medicare and Medicaid.

**Fourth**, the Defendants ordered and performed grossly **excessive and unnecessary and substandard imaging studies** via a "shotgun" ordering approach and multiple duplicate tests.

41.    **Illegal referral kickback scheme.** This case involves an illegal referral kickback scheme implemented by Defendants, whereby physicians, including Defendants RAOUF, RAO, DASSANI, BIENSTOCK, KRICKO, KOLLI, RASHID, BRABSTON, THIRUMAVALAVAN, CODELLA, REICH-SOBEL, LOSOS, SIDALI, STACK, LENTINE, KOENINGSBERG, SCHULMAN, KALRA and GREENSPAN, referred patients to Defendants MDT NJ, MDT NY, MDT CA, MDT PA, ALPHA SCAN, VIJAY PATEL, DIPEN V. PATEL, HIMESH V. PATEL, and ALKA V. PATEL in exchange for monetary kickbacks in the form of "rental" payments made above the fair market value. The referral kickback scheme violated and continues to violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b *et seq.*, the Fraud Enforcement Recovery Act of 2009 ("FERA"), 31 U.S.C. §§ 3729-3733, the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1, *et seq.*, the New York False Claims Act, N.Y. Stat. § 189 *et seq.* and the California False Claims Act, Cal. Gov't Code § 12651(a) *et seq.*

42.    **Illegal corporate practice of medicine.** This case also involves an illegal scheme run by Defendant MDTs owned and operated by Defendants owned by VIJAY PATEL and operated by Defendants VIJAY PATEL, DIPEN V. PATEL, HIMESH V. PATEL, and ALKA V. PATEL all of whom are lay business people which, appears to be in violation of New Jersey and New York's laws barring the corporate practice of medicine.

43. **Lack of direct supervision.** Defendants also falsely represented to Medicare and Medicaid that direct supervision of tests that required physician presence in the office suite or in the mobile unit would be performed by specific physicians whose credentials were presented to Medicare and Medicaid.

44. **Unnecessary and substandard imaging studies.** This case also involves Defendants MDT NJ, MDT NY, MDT PA and MDT CA, and ALPHA SCAN, and their owners and employees/agents, performance of unnecessary imaging studies and billing for unnecessary imaging studies and/or billing for substandard imaging studies by way of example failure to include the requisite technologists' documentation, failure to image the appropriate areas, inclusion of artifacts leading to image distortion and failure to take the complete views of the imaged site.

45. Defendants' unnecessary testing and false billing for non-indicated radiology tests is evidenced, in part, by the referring physicians, including Defendants RAOUF, RAO, DASSANI, BIENSTOCK, KRICKO, KOLLI, RASHID, BRABSTON, THIRUMAVALAVAN, CODELLA, REICH-SOBEL, LOSOS, SIDALI, STACK, LENTINE, KOENINGSBERG, SCHULMAN, KALRA and GREENSPAN use of protocol (also known as "shotgun") testing and/or their practice of ordering of the same set of imaging tests on the same patients, even ordering identical tests for husbands and wives on the same date.

46.    In turn, the unnecessary tests ordered by Defendants RAOUF, RAO, DASSANI, BIENSTOCK, KRICKO, KOLLI, RASHID, BRABSTON, THIRUMAVALAVAN, CODELLA, REICH-SOBEL, LOSOS, SIDALI, STACK, LENTINE, KOENINGSBERG, SCHULMAN, KALRA and GREENSPAN were performed by Defendants MDT NJ, MDT NY, and ALPHA SCAN.

47.    Based on Defendant DIPEN V. PATEL's representations to Relator, MDT PA and MDT CA also had referring doctors who engaged in protocol testing.

48.    Relator believes that the entity H & D is the entity Defendants VIJAY PATEL, DIPEN V. PATEL, HIMESH V. PATEL, and/or ALKA V. PATEL established to provide imaging services in place of and/or in addition to MDT NJ as it is located at the same address as MDT NJ.

49.    Relator is a board certified radiologist and he is, or has been, a licensed medical doctor in the States of California, Indiana, Michigan, New Jersey, New York, Illinois, Missouri and Wisconsin.

50.    From 2004 to present, Relator has been and is currently the President and Medical Director of Radiology Medical Consultants, PC ("RMC").

51.    RMC provides professional imaging interpretation and teleradiology interpretation for other imaging centers.

52.     Defendant MDT NJ is for the relevant time period an outpatient medical testing company, organized as an Independent Diagnostic Facility ("IDTF") with its headquarters located at 60 Baldwin Rd, Parsippany, New Jersey.

53.     On or about September 12, 2014, Defendants DIPEN PATEL and HIMESH PATEL created Defendant H & D SONOGRAPHY located at 60 Baldwin Road, Parsippany, New Jersey, which is the same physical location as Defendant MDT NJ's New Jersey headquarters.

54.     Defendant VIJAY PATEL owns Defendants MDTs.

55.     Defendant VIJAY PATEL is the President of MDT NJ.

56.     MDT also has, or has had locations at 42820 Albrae Street, Fremont, California, 251 East 5th Street, Brooklyn, New York and 920 Madison Avenue, Suite 2 Audubon, Pennsylvania.

57.     Defendant ALKA V. PATEL is listed as the President of MDT PA.

58.     Defendant VIJAY PATEL has at least two sons, Defendants DIPEN V. PATEL, NCT-C and HIMESH PATEL who work for some or all of the Defendants MDTs.

59.     Defendant DIPEN PATEL is the Resident Agent for MDT CA and serves as the Marketing Director for some or all of the MDTs.

60.     Per Defendant DIPEN PATEL's business card, the MDTs provide the following services: "Echocardiography, Ultrasonography, Transtelephonic Event

Monitoring System, Critical Care Assessment System, Vascular Doppler, ABI/PVR Measurement, Videonystogmography, Electrodiagnostic Service [and] Ambulatory Electroencephalography."

61.     In addition, Defendant DIPEN PATEL's business card indicates that he is a certified nerve conduction technologist.

62.     Defendant HIMESH PATEL informed Relator that he is an Ultrasonographer who performed ultrasound exams on some of MDTs' patients.

63.     On or about October 7, 2011, Relator received a call from Ms. Yvonne Ward, Project Manager at the law offices of LicensePro LLC in New York City (www.LicenseProUSA.com), informing him of a new IDTF business in New Jersey (MDT NJ), that needed help with radiology interpretations.

64.     Relator agreed to call MDT NJ's business contact, DIPEN PATEL and discuss the company's professional service needs.

65.     On or about October 11, 2011, Relator had a phone conversation with Defendant DIPEN PATEL regarding MDTs' businesses and their needs.

66.     From on or about October 2011, Relator and Defendant DIPEN PATEL continued to have email correspondence regarding Dr. Chesbrough's license status for the practice of medicine in New Jersey, fees, the scope of work Defendants MDTs sought from Relator and RMC and billing.

67.     On or about February 24, 2012, Defendant DIPEN PATEL sent an email to Relator indicating the types of procedures the MDTs perform and a list of referring doctors.

68.     On February 27, 2012, Relator on behalf of RMC entered into a contract with MDT NJ to interpret general and vascular ultrasounds and any other radiology/imaging studies requested.

69.     On or about April 1, 2012, Relator on behalf of RMC entered into a contract with MDT CA to interpret imaging studies, in particular general and vascular ultrasounds.

70.     On May 5, 2012, Relator and his wife met with DIPEN A. PATEL in New York to discuss RMC's working relationship with Defendants MDT NJ and MDT CA. During the course of this meeting, Defendant DIPEN PATEL informed Relator that his father, Defendant VIJAY PATEL owned several MDTs or other IDTFs.

71.     On or about May 5, 2012, Defendant DIPEN PATEL told Relator that Dr. Marc Silidker, M.D. served as MDT's Medical Director for its New Jersey location, and that he (Dr. Chesbrough), would not need to serve as Medical Director for the MDT business.

72.     Throughout the entire time Relator provided services to MDT, Relator never met Dr. Silidker.

73.     Prior to owning and operating Defendants MDTs, Defendant VIJAY PATEL had provided mobile imaging to nursing homes.

74.     On May 7, 2012, Relator sent an email to Defendant DIPEN PATEL regarding the meeting of May 5, 2012, requested a future meeting, information about RMC's eRAD RIS/PACS system and information about a possible technologist for Defendant MDT CA.

75.     In an effort to help Defendant MDT to comply with HIPAA laws and meet required teleradiology standards, Relator convinced Defendant MDT to use a nationally recognized, state-of-the-art computer system for Defendants MDTs' imaging studies.

76.      On or about September 2012, RMC implemented the "eRAD" Picture Archiving and Communications System ("PACS"), which is a computer software program that stores the patients' images, the radiologists' interpretations of tests and tracks the types of studies performed.

77.     In order to complete a radiology reading and to render a report, the testing entity, like Defendants MDTs, should send the reading radiologist at RMC the following information: a) patient log sheets bearing the patient's name; type of test(s); brief clinical history and name of the ordering physician; b) the ultrasound technologist's worksheet (for ultrasound studies) which includes the measurement of

the various organ(s), his/her notes based on the patient's history and pertinent clinical history; and c) the technologist's initial impression.

78.     On January 8, 2013, Relator sent an email to Defendants HIMESH PATEL and DIPEN PATEL, noting that he and his staff continued to have problems obtaining imaging studies in a time-sensitive manner, that he had several dozen pages of log sheets and tech worksheets that did not contain images on the eRAD system or that the studies on eRAD had no paperwork with them.

79.     On January 8, 2013, Relator also noted that the failure to have the missing information was creating serious patient safety issues.

80.     On October 3, 2013, Relator sent an email to Defendants HIMESH PATEL and DIPEN PATEL regarding quality assurance issues with the ultrasound studies stating

1)    There was a MASS in the liver on a recent patient that was captured on the images, measured and documented. Yet, there was NO MENTION on the tech worksheet.... This not standard quality for technologist's work. This needs to be corrected.

2)    Carotid ultrasound studies are being done without critical documentation by the technologist. The ICA/CCA ratios must be calculated (measuring highest velocities), and the DIRECTION of flow of the vertebral arteries must be documented. This is not being done consistently and must be corrected....

(Emphasis supplied).

81.     On October 3, 2013, Defendant DIPEN PATEL responded to Relator's

October 3, 2013 email stating "Those are Himesh's studies. Will speak to him today

about these serious issues."

82.     On or about April 2014, Defendants MDTs, in breach of its contracts with RMC, abruptly and without explanation ceased sending cases to RMC falsely claiming that 'business was slow.'

83.     In response to Relator's continued questions about the cessation of sending cases to RMC, Defendant DIPEN PATEL, on behalf of Defendants MDTs finally admitted to Relator that they had found another radiology group that was local, apparently in the New Jersey area.

84.     Defendant DIPEN PATEL also stated that MDT needed this new group to get on additional insurance plans that RMC could not participate in.

85.     During the time period Relator provided services to Defendants MDTs, ALPHA SCAN, VIJAY PATEL, DIPEN V. PATEL, HIMESH V. PATEL and ALKA V. PATEL, DIPEN V. PATEL told Relator that MDT pays referring physicians "rental fees" for the use of their offices to perform mobile diagnostic testing.

86.     Per Defendant DIPEN V. PATEL, MDT brought in its technicians and equipment to offices of various referring doctors, including Defendants, RAOUF, RAO, DASSANI, BIENSTOCK, KRICKO, KOLLI, RASHID, BRABSTON, THIRUMAVALAVAN, CODELLA, REICH-SOBEL, LOSOS, SIDALI, STACK, LENTINE, KOENINGSBERG, SCHULMAN, KALRA and GREENSPAN.

87.     There is no safe harbor that applies to the kickback scheme at issue in this case. The referral program at issue in this case does not fall within either the Investor Test or Revenue Test safe harbors. 42 CFR 1001.952(a)(2)(i) and (vi).

88.     Relator's review of MDTs' images routinely showed mild to no disease, or disease that was consistent with the patient's age and essentially unremarkable.

89.     In addition, Relator observed "protocol" or "shotgun" ordering whereby every patient received the identical sets of three (or more) tests, with few, if any, clinical indications.

90.     Defendant ALPHA SCAN's mailing address is 60 Skyline Drive, Ringwood, NJ, 07456-2039 and its practice location is 545 Goffle Rd., Wyckoff, NJ 07481-2071.

91.     Defendant ALPHA SCAN's NPI number is 1073669545.

92.     The President of Defendant ALPHA SCAN is Defendant RAOUF, who is also a referring doctor to at least Defendant MDT NJ.

93.     Defendant ALPHA SCAN provides diagnostic radiology services.

94.     Defendant ALPHA SCAN's Medicare PIN is 089752.

95.     Relator's wife, Kim Chesbrough, performed RMC's billing for the MDTs' accounts, billing MDTs a per-study reading (professional interpretation) fee.

96.     RMC did not bill patients, patient's insurance companies, or Medicare/Medicaid.

97.     On or about February, 2013, Mrs. Chesbrough, working with the eRAD software, inadvertently billed Defendant MDT NJ twice for studies on the same patient.  This billing error occurred because MDT NJ listed a particular group of patients under the MDT NJ's heading, while at the same time it listed this same group of patients under the heading of Defendant ALPHA SCAN.

98.     RMC became aware of this issue when Defendant DIPEN PATEL contacted Mrs. Chesbrough and asked her about what appeared to be double billing.

99.     Mrs. Chesbrough, on behalf of RMC, corrected this error.

100.    Defendant DIPEN PATEL informed her that he had accessed the eRAD system and that he had changed the header information on a group of patient's studies, from MDT to ALPHA SCAN, without informing Mrs. Chesbrough prior to making this change.

101.    On August 8, 2013, Defendant DIPEN PATEL sent an email to Mrs. Chesbrough regarding MDT NJ's July 2013 bill, advising her that MDT NJ's "studies are being read and then charged to Alpha Scan Imaging letterhead **due to billing purposes**." (Emphasis added).

102.    On September 12, 2013, Defendant DIPEN PATEL sent an email to RMC and Kim Chesbrough stating, in part, "29 Alpha Scan studies.  Already paid in the past.  Moved from MDTNJ [MDT New Jersey] **due to billing purposes** after invoice from MDTNJ was paid." (Emphasis added)

103.   On or about September 12, 2014, long after MDTs had stopped sending cases to RMC, Mrs. Chesbrough received a phone call from Mr. Seth Mull, an "IS Systems Analyst" for eRAD.  Mr. Mull informed Mrs. Chesbrough that a former customer, MDT, was trying to access RMC's eRAD database.

104.   On September 12, 2014, Mrs. Chesbrough, on behalf of RMC, sent an email to Mr. Mull confirming their prior discussion regarding MDT's efforts to access RMC's eRAD.

105.   Mrs. Chesbrough further stated that RMC is no longer doing business with Defendant MDT and Defendant ALPHA SCAN because "we discovered they are changing their letterheads for billing."  She further instructed Mr. Mull to deny access to the eRAD system to Defendants DIPEN PATEL, HIMESH PATEL and their businesses.

### Independent Diagnostic Testing Facilities ("IDTF")

106.   Per 42 C.F.R. §410.33, which governs IDTFs, "carriers will pay for diagnostic procedures under the physician fee schedule only when performed by . . . an independent diagnostic testing facility . . . an IDTF may be . . . an individual non-physician practitioner."

107.   In order for an IDTF to recover fees for diagnostic tests, IDTFs must comply with the following requirements:

(b)(1) An IDTF must have one or more supervising physicians who are responsible for the direct and ongoing oversight of the quality of the testing performed, the proper calibration of the equipment used to perform tests, and the qualification of nonphysician personnel who use the equipment. This level of supervision is required for general supervision set forth in § 410.32(b)(3)(i).

(2) The supervising physician must evidence proficiency in the performance and interpretation of each type of diagnostic procedure performed by the IDTF. The proficiency may be documented by certification in specific medical specialties or subspecialties or by criteria established by the carrier for the service area in which the IDTF is located. In the case of a procedure requiring personal supervision of a physician as set forth in § 410.32(b)(3)(ii) or (b)(3)(iii), the IDTF's supervising physician must personally furnish this level of supervision whether the procedure is performed in the IDTF or, in the case of mobile services, at the remote location. The IDTF must maintain documentation of sufficient physician resources during all hours of operations to assure that the required physician supervision is furnished. In the case of procedures requiring direct supervision, the supervising physician may oversee concurrent procedures.

. . . .

(d) Ordering of tests. All procedures performed by the IDTF must be specifically ordered in writing by the physician who is treating the beneficiary, that is, the physician who is treating a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem.

. . . .

(f) Applicability of State law. An IDTF must comply with the applicable laws of the state in which it operates.

108.   Defendant MDT NJ, as an IDTF operating in New Jersey, must comply

with its laws governing corporations.

{H0268483.1}                             24

109.    Defendant MDT NY, as an IDTF operating in New York, must comply with its laws governing corporations.

110.    Defendants MDT NJ and MDT NY, were and are, IDTFs that performed services beyond testing, including actual diagnoses, and as such must be incorporated as a professional corporation or as a non-profit corporation.

111.    Defendants MDT NJ and MDT NY as described above did not comply with the applicable laws of the States of New Jersey and New York, respectively.

112.    New Jersey law bans the corporate practice of medicine.  N.J.A.C. § 13:35-6.16(f).

113.    New York law prohibits the corporate practice of medicine.  N.Y. Educ. Law §§ 6521 and 6527.

114.    Defendant VIJAY PATEL is not a licensed professional authorized to engage in activities which constitute the practice of medicine and diagnostic radiology.

115.    Defendant DIPEN V. PATEL is not a licensed professional authorized to engage in activities which constitute the practice of medicine and diagnostic radiology.

116.    Defendant HIMESH V. PATEL is not a licensed professional authorized to engage in activities which constitute the practice of medicine and diagnostic radiology.

117.    Defendant ALKA V. PATEL is not a licensed professional authorized to engage in activities which constitute the practice of medicine and diagnostic radiology.

118.    Defendants MDT NJ, MDT NY, VIJAY PATEL, DIPEN V. PATEL, HIMESH V. PATEL and ALKA V. PATEL have been illegally practicing medicine under the applicable laws of New Jersey and New York.

119.    Defendants MDT NJ and MDT NY are illegally operating in the States of New Jersey and New York, respectively, they have no authority to bill Medicare or Medicaid for services rendered.

120.    Because MDT NJ and MDT NY have never been in compliance with state law as to its basic corporate structure, they were not and are not eligible to enroll in Medicare as an IDTF. All claims for payment submitted to Medicare from Defendants MDT NJ and MDT NY were void *ab initio*.

121.    Per 42 C.F.R. §410.33an IDTF must have a physician supervisor or "medical director" who has the authority for overall management and supervision of the IDTF.

122.    The overall supervising physician or medical director is responsible to ensure that standard safety and qualification standards are met.

123.    According to the federal regulations, an IDTF is required to have one or more overall "supervising physicians who are responsible for the direct and ongoing oversight of the quality of the testing performed, the proper operation and calibration of the equipment used to perform tests, and the qualifications of the non-physician personnel who use the equipment."

124. The Medicare regulation makes it clear that the medical director must have authority over policies and procedures of the IDTF and that such authority must not be left to non-licensed individuals to manage a radiology or medical practice.

## THE FALSE CLAIMS ACT

125. The False Claims Act (hereafter "FCA" provides for the award of treble damages and civil penalties for, among other things, knowingly causing the submission of false or fraudulent claims for payment to the United States government. 31 U.S.C. § 3729(a)(1).

126. The FCA states, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains 31 U.S.C. § 3729.1

For purposes of the FCA, the term "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the

information; and requires no proof of specific intent to defraud.31 U.S.C. § 3729(b).

## MEDICARE PROGRAM

127.   Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of healthcare services for certain individuals. HHS is responsible for the administration and supervision of the Medicare program, which it does through Centers for Medicare & Medicaid Services (hereafter "CMS"), an agency of HHS.

128.   The Medicare Program is a health insurance program for individuals 65 years and older, certain disabled individuals under age 65, and people of any age who have permanent kidney failure. The Medicare statute is codified at 42 U.S.C. § 1395 (Title XVIII of Social Security Act, 42 U.S.C. § 483.1 *et seq*.).

129.   As a condition of participation in the Medicare program and as a condition precedent to the receipt of payment or reimbursement from Medicare of costs incurred for treating and providing care to Medicare beneficiaries, Defendants are required to certify that each was familiar with the laws and regulations regarding the provision of healthcare services and that the services being billed for reimbursement were in compliance with Medicare laws and regulations.

130.    Through actions as set forth in this Complaint, Defendants knowingly submitted and caused to be submitted false claims to Medicare in violation of the federal and the States' False Claims Act at issue herein.

131.    The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009. Given the nature of the claims at issue, Sections 3279(a)(1) and 3279(a)(7) of the prior statute, and Section 3729(a)(1)(A) and 3729(a)(1)(G) of the revised statute are all applicable here. Sections 3729(a)(1) and 3729(a)(7) apply to conduct that occurred before FERA was enacted, and sections 3729(a)(1)(A) and 3729(a)(1)(G) apply to conduct after FERA was enacted. Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA, which makes the new changes to that provision applicable to all claims for payment pending on or after June 7, 2008.

132.    CMS contracted with "fiscal intermediaries" To assist in the administration of Medicare Part A. 42 U.S.C. § 1395h.  The fiscal intermediaries, usually insurance companies, were and are responsible for processing and paying claims and cost reports.

133.    CMS contracted with "carriers" to assist in the administration of Medicare Part B.   Carriers, typically insurance companies, were and are responsible for processing and paying Part B claims.

134. Starting in November 2006, Medicare Administrative Contractors ("MACs") began replacing the carriers and fiscal intermediaries. Fed. Reg. 67960, 68181 (Nov. 2006). In general the MACs act on behalf of CMS to process and pay Part A and Part B claims and to perform administrative functions on a regional level. 42 § C.F.R. 421.5(b).

135. In order to be eligible to participate in Medicare Part A, providers must periodically sign an application to participate in the program which contains a certification statement that states

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

136. Under the Medicare program, CMS makes payments after the provider renders services.

## ANTI-KICKBACK FRAMEWORK

137. The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b *et seq.*, prohibits payments, directly or indirectly designed to induce a person to refer or recommend services that may be paid for by federal government.

138. The AKS provides that those who knowingly and willfully solicit or receive, offer or pay receive anything of value, whether directly or indirectly, in exchange for or to induce the referral of items or services for which a federal health care program may make payment shall be guilty of a felony. 42 U.S.C. § 1320a-7b(b)(1). The AKS makes it a criminal offense for someone to knowingly and willfully solicit, pay, or receive any remuneration to induce or benefit referrals which are payable by a Federal health care program. *See* 42 U.S.C. 1320a-7(b).

139. No safe harbor applies to the referral/kickback scheme alleged in this case. The referral program at issue in this case does not fall within either the Investor Test or Revenue Test safe harbors. 42 CFR 1001.952(a)(2)(i) and (vi).

140. Penalties for violation of the AKS include imprisonment up to five years, fines up to $25,000, or both, and mandatory exclusion from the Federal health care programs. 42 U.S.C. §1320a-7(b).

The OIG may also impose civil monetary penalties or initiate administrative proceedings to exclude said party from the Federal health care program for violation of the Act. *Id.*; 42 U.S.C. §1320a-7(a). The government may also assess civil money penalties, which could result in treble damages plus $50,000 for each violation of the AKS. 42 U.S.C § 1320a-7a(a)(7). Further, the payment of kickbacks is a basis for False Claims Act liability. *See* 31 U.S.C. §§ 3729–3733.

{H0268483.1}

31

## Medicare Coverage of Diagnostic Radiology Tests

141.   Part B of Medicare covers physician services and laboratory tests.

142.   The basic requirement for any claim to be payable by Medicare is that the service must be "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. §1395y(a)(1)(A).

143.   What constitutes "reasonable and necessary" is based upon accepted practices in the medical community, as further defined by National Coverage Determinations issued by CMS and by Local Coverage Determinations and guidance issued by the Medicare administrative contractors for their respective regions. Under this standard, Medicare pays for diagnostic radiology tests, but deems those tests to be reasonable and necessary and thus payable only if there is physician supervision of the test under the standards established by the Medicare program. As of January 1998, all diagnostic radiology tests have required some type of physician supervision to be payable. The supervision is an integral part of the test, and by definition any unsupervised test is not reasonable and necessary, and therefore not payable by Medicare. 42 C.F.R. § 410.32(b).

144.   There are different types of supervision applicable to diagnostic radiology tests depending upon the danger posed to the patient from the test.

145.   All diagnostic radiology tests, no matter where they are conducted or by whom, require at least "general supervision" by a physician in order to be payable by

Medicare, meaning that a physician agreeing to perform such supervision has "continuing responsibility" to "train[] the non-physician personnel who actually perform the "diagnostic procedure" and to "mainta[in] the necessary equipment and supplies" for the test. 42 C.F.R. § 410.32(b)(3)(i).

146. The purpose of "general supervision" is to ensure that the technician and the equipment are in working order generally. Further, the "physician's presence is not required" during any actual test where there is no specific anticipated potential danger to the patient from improper performance of the test. 42 C.F.R. § 410.32(b)(3)(i).

147. Thus, standard X-rays, Magnetic Resonance Imaging ("MRI") tests without any injection of contrast media as to which there could potentially be an allergic reaction, Computerized Tomography ("CT") scans without contrast media, and nuclear imaging tests that do not involve stress on the heart, require "general supervision;" that is that the test can be submitted for payment as long as there is a physician responsible for making sure that the technician doing the test has been trained and that the equipment works, but the physician does not actually have to be on the premises when the test is conducted.

148. Nuclear imaging tests also require general supervision by a physician with a license to handle nuclear materials from the Nuclear Regulatory Commission.

149. For tests that involve some inherent possibility of immediate danger to the patient, for example physical or chemical stress on the heart, and MRI and CT tests involving injection of contrast media, where there is some possibility of adverse or

{H0268483.1} 33

allergic reaction, Medicare requires that there be "direct" supervision of the test, meaning that, in addition to the requirement that a physician exercise "general supervision" over the technician and the equipment, a physician also has to be "in the office suite" and "immediately available to furnish assistance and direction" in the event of an adverse reaction. 42 C.F.R. § 410.32(b)(3)(ii).

150. "In the office suite" means in the office suite of the entity conducting the test. In the context of a mobile unit, "in the office suite" means in the mobile unit, unless the mobile unit is attached to the building and connected to an office suite where the physician is located.

151. Physicians, other individual providers, and certain legal entities may apply for enrollment in the Medicare program. After they submit an enrollment application making representations as to their qualifications for enrollment, Medicare through its administrative contractors evaluates the representations and certifications contained on the enrollment application and determines whether to permit the individual or entity to enroll. Once an individual or entity is approved for enrollment, it is assigned a "Provider Number," which then entitles it to bill the Medicare program and receive payment. At all relevant times hereto, providers seeking to enroll in the Medicare program were required to sign certifications acknowledging that any payment received from the Medicare program for any claim was contingent on, among other things, the provider having complied with the federal Medicare anti-kickback statute and the Stark laws and

{H0268483.1}                                    34

regulations in connection with that claim, which prohibit fee-splitting and payments for referrals, see 42 U.S.C. § 1320a-7b(a)-(b); 42 U.S.C. § 1395nn(a)(1).

## Medicare Coverage of Claims Submitted by
## Independent Diagnostic Testing Facilities

152.    Medicare authorizes a particular provider type called an "independent diagnostic testing facility," or "IDTF."

153.    CMS defines an IDTF as an entity independent of a hospital or physician's office where diagnostic tests are performed by licensed, certified, non-physician personnel under appropriate physician supervision.  See 42 C.F.R. § 410.33(a).

154.    IDTFs have always been required to have "one or more supervising physicians" doing what is required "for general supervision set forth in 42 C.F.R. § 410.32(b)(3)(i)," which includes quality oversight, proper operation and calibration of the testing equipment, and training and qualification of the technicians. 42 C.F.R. § 410.33(b)(1).

155.    IDTFs have always been required to "evidence proficiency" of all of its supervising physicians to the Medicare contractor "in the performance and interpretation of each type of diagnostic procedure performed by the IDTF." 42 C.F.R. § 410.33(b)(2).

156.    The regulation lists two methods to demonstrate such proficiency to the Medicare contractor: "by certification in specific medical specialties or subspecialties," or by other "criteria established by the [Medicare administrative] carrier."

157. In the case of a diagnostic test requiring the physician's presence in the office suite because of some inherent danger to the patient from the test, as set forth in 42 C.F.R. § 410.32(b)(3)(ii) or (b)(3)(iii), the regulation makes clear that the "IDTF's supervising physician must personally furnish this level of supervision whether the procedure is performed in the IDTF or, in the case of mobile services, at the remote location." *Id.* The regulation assumes that any IDTF employing mobile units to conduct diagnostic tests requiring physician presence will employ the services of a physician who would travel with the mobile unit.

158. To receive provider status and thus be entitled to bill Medicare, an IDTF has always been required to list all of the supervisory physicians that it intends to use and provide information to Medicare about the proposed physician supervisors' qualifications. http://www.cms.hhs.gov/CMSforms/downloads/cms855b.pdf [hereinafter "855B application"] pp. 5, 46.

159. The IDTF has always been required to fill out an application that contains a certification form that states on its face that it must be filled out by "All Supervising Physician(s) rendering supervisory services for this IDTF" Id. p. 47.

160. Each one of the IDTF's supervising physicians have always been required to "certify" to Medicare the identity of each of the test types that he/she is going to supervise for the IDTF so that Medicare can determine whether the physician's qualifications match the characteristics of the test(s) that he/she states he/she is going to

{H0268483.1}                                        36

supervise. The physicians must also certify to Medicare's satisfaction that they have "the required proficiency in the performance and interpretation of each type of diagnostic procedure" that they are certifying that they are going to supervise. See 855B application, supra, p. 47.

161.    As part of the "mandatory" documentation requirements required to support the application, the entity seeking IDTF status must submit "[c]opy(ies) of all documentation verifying the IDTF's supervisory physician(s) proficiency." Id. at p. 35. If any changes are made to the supervisory physician staff, the IDTF certifies that it will notify the Medicare contractor of this change, providing the appropriate certifications and documentation for any new supervisory personnel, within 90 days. Id. pp. 1, 3, 31 par. 1, 39 par.2.

162.    The Medicare contractor reviews each physician's credentials, rejects physicians who do not have the appropriate credentials, and calls each supervising physician to ensure that they understand the required different levels of supervision.

163.    IDTFs have always been required to "maintain documentation of sufficient physician resources during all hours of operations to assure that the required physician supervision is furnished." 42 C.F.R. § 410.32(b)(2).

164.    As to the tests that MDTs and ALPHA SCAN conduct, many required supervision by a board eligible or board certified radiologist or cardiologist.

165.  In accordance with DHHS's Transmittal B-01-28 Program Memorandum

Carriers "LEVELS OF PHYSICIAN SUPERVISION OF DIAGNOSTIC TESTS"

states, in pertinent part,

> 1 = Procedure must be performed under the general supervision of a physician.
>
> 2 = Procedure must be performed under the direct supervision of a physician.
>
> 3 = Procedure must be performed under the personal supervision of a physician.
>
> 4 = Physician supervision policy does not apply when procedure personally furnished by a qualified, independent psychologist or a clinical psychologist; otherwise must be performed under the general supervision of a physician.
>
> 5 = Physician supervision policy does not apply when procedure personally furnished by a qualified audiologist; otherwise must be performed under the general supervision of a physician.
>
> 6 = Procedure must be personally performed by a physician OR a physical therapist who is certified by the American Board of Physical Therapy Specialties (ABPTS) as a qualified electrophysiologic clinical specialist and is permitted to provide the service under State law.

## LEVEL OF PHYSICIAN SUPERVISION OF SPECIFIC DIAGNOSTIC TESTS

| CODE LEVEL | CODE LEVEL | CODE LEVEL |
|------------|------------|------------|

### DIAGNOSTIC ULTRASOUND

### HEAD AND NECK

| CODE LEVEL | CODE LEVEL | CODE LEVEL |
|------------|------------|------------|
| 76506 & TC 2 | 76511 & TC 3 | 76512 & TC 3 |
| 76513 & TC 3 | 76516 & TC 2 | 76519 & TC 2 |
| 76529 & TC 2 | 76536 & TC 1 | |

## ABDOMEN AND RETROPERITONEUM

| | | |
|---|---|---|
| 76700 & TC 1 | 76705 & TC 1 | 76770 & TC 1 |
| 76775 & TC 1 | 76778 & TC 1 | |

## SPINAL CANAL

76800 & TC 2

## PELVIS

| | | |
|---|---|---|
| 76805 & TC 2 | 76810 & TC 2 | 76815 & TC 2 |
| 76816 & TC 1 | 76818 & TC 1 | 76825 & TC 2 |
| 76826 & TC 1 | 76827 & TC 1 | 76828 & TC 1 |
| 76830 & TC 1 | 76831 & TC 3 | 76856 & TC 1 |
| 76857 & TC 1 | 76870 & TC 1 | 76872 & TC 1 |

## EXTREMITIES

| | | |
|---|---|---|
| 76880 & TC 1 | 76881 & TC 1 | 76882 & TC 1 |
| 76885 & TC 2 | 76886 & TC 1 | |

## OTHER PROCEDURES

| | | |
|---|---|---|
| 76970 & TC 1 | 76975 & TC 3 | 76977 & TC 1 |
| 76986 & TC 3 | | |

## OTHER SPECIALIZED SERVICES

| | | |
|---|---|---|
| 92265 & TC 3 | 92270 & TC 3 | 92275 & TC 3 |
| 92283 & TC 1 | 92284 & TC 1 | 92285 & TC 2 |
| 92286 & TC 3 | | |

## CARDIOGRAPHY

| | | |
|---|---|---|
| 93000 1 | 93005 1 | 93012 1 |
| 93015 2 | 93016 2 | 93017 2 |
| 93024 & TC 3 | 93040 1 | 93041 1 |

| 93224 1 | 93225 1 | 93226 1 |
|---------|---------|---------|
| 93230 1 | 93231 1 | 93232 1 |
| 93235 1 | 93236 1 | 93268 1 |
| 93270 1 | 93271 1 | 93278 & TC 1 |

## ECHOCARDIOGRAPHY

| 93303 & TC 1 | 93304 & TC 1 | 93307& TC 1 |
|--------------|--------------|-------------|
| 93308 & TC 1 | 93312 & TC 3 | 93313 3 |
| 93314 3 | 93315 & TC 3 | 93316 3 |
| 93317 3 | 93320 & TC 1 | 93321 & TC 1 |
| 93325 & TC 1 | 93350 & TC 1 | |

## CEREBROVASCULAR ARTERIAL STUDIES

| 93875 & TC 1 | 93880 & TC 1 | 93882 & TC 1 |
|--------------|--------------|-------------|
| 93886 & TC 1 | 93888 & TC 1 | |

## EXTREMITY ARTERIAL STUDIES

| 93922 & TC 1 | 93923 & TC 1 | 93924 & TC 1 |
|--------------|--------------|-------------|
| 93925 & TC 1 | 93926 & TC 1 | 93930 & TC 1 |
| 93931 & TC 1 | | |

## EXTREMITY VENOUS STUDIES

| 93965 & TC 1 | 93970 & TC 1 | 93971 & TC 1 |
|--------------|--------------|-------------|

## VISCERAL AND PENILE VASCULAR STUDIES

| 93975 & TC 1 | 93976 & TC 1 | 93978 & TC 1 |
|--------------|--------------|-------------|
| 93979 & TC 1 | 93980 & TC 1 | 93981 & TC 1 |

## EXTREMITY ARTERIAL-VENOUS STUDIES

93990 & TC 1

166.   Board eligible or certified internal medicine physicians could be accepted to supervise the stress portion of a cardiac stress test but they cannot supervise imaging component, which would require a cardiologist.

167.   Family practice physicians and internal medicine physicians who lack board certification or eligibility are not eligible to supervise any part of any diagnostic test that Defendants MDTs and ALPHA SCAN are performing.www.wpsmedicare.com/part_b/policy/active/local/_files/123448_phys078 _appendix.pdf.

168.   In addition to the credentialing requirements set forth above, the IDTF must adhere to the following additional requirements:

a.   It must comply with all state law requirements applicable to it, 42 C.F.R. §§ 410.33(f), (g)(1); 855B application, supra, p. 39 paragraph 1.

b.   It must disclose the identity and qualifications of each of its technicians on an ongoing basis to Medicare and must provide supporting documentation concerning their qualifications, and must notify Medicare of changes to its technicians within 90 days, 42 C.F.R. §§ 410.33(c), 410.33(g)(2); 855B application, supra, p. 39 paragraph 2; id. p. 44.

c.   If it is providing mobile units outside of its own physical locations it must  tell Medicare what zip codes or towns it is providing services in, and notify it

of any changes of location within 30 days of the change, 42 C.F.R. § 410.33(g)(2); 855B application, p. 39 paragraph 2.

      d.     It must disclose to Medicare what tests it is intending to perform as well as all equipment including model number it is using to conduct those tests, and provide information about any changes to equipment within 90 days; 42 C.F.R. §410.33(g)(4)(iii); 855B application, at p. 39 paragraphs 2, 4.

      e.     It must agree to comply with all Medicare program instructions applying to it and must both acknowledge that all such instructions are available from Medicare and that payment is contingent upon its compliance with all applicable laws, regulations and program instructions. 855B application, p. 31 paragraph 3.

## THE INTERPLAY BETWEEN MEDICARE, ANTI-KICKBACK ACT AND THE STARK LAW

169.    Two statutory provisions prohibit payments to individuals or entities who refer, recommend, or order health care goods and services. The Health Care Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(a)-(b), prohibits knowing and willful payment or receipt of remuneration to induce Medicare referrals. The Stark Law, 42 U.S.C. § 1395nn(a)(1), conditions Medicare payment as a matter of strict liability upon the absence of any referrals for imaging services to entities from which the physicians receive financial benefits, unless the conduct falls into an exception. There is a "de minimis" exception for annual small gifts not exceeding approximately $350 in value,

42 U.S.C. § 411.357(k). During all relevant time periods, payments made in connection with all imaging studies, including ultrasound, magnetic resonance and computed tomography tests were subject to the Stark law.

170. Nuclear medicine (cardiac stress) tests became subject to the Stark law on January 1, 2007.

171. While there are exceptions to the prohibitions contained in both statutes, the burden is on the payor and the payee to show that they fall into an exception.

172. Both the Stark and anti-Kickback regulations provide that, at a minimum, any agreement must be in writing and signed by the parties, and any agreement must meet a basic test of commercial reasonableness. 42 C.F.R. § 411.357(a)-(d), (l); 42 C.F.R. § 1001.952(b) (d).

173. In other words, if the contract would not be commercially reasonable absent the referral stream it induces, it does not fall within the exception.

174. As part of the certification process for an IDTF, a high-level "authorized official" of any prospective IDTF must certify that he/she will not pay kickbacks to referring physicians (see 42 U.S.C. § 1320a-7b(b)(2)) and will not violate the Stark law, 42 U.S.C. § 1395nn(a)(1)(A) & (B). The high-level authorizing official must certify that he/she has been put on notice that any payment to the IDTF is contingent upon their adhering to these certifications.

{H0268483.1}                                           43

175.   Notwithstanding the regulatory exceptions to the prohibition upon payments to physicians in connection with their referrals of patients to an IDTF, no payments made by an IDTF to a referring physician without a written contract in place can ever fall within any exception.

176.   Payments made that are not commercially reasonable outside of the unlawful purpose to induce referrals can ever fall within any exception.

177.   Payments made that do not reflect an arms-length negotiated fair market value can ever fall within any exception.

178.   Payments made in connection with a contract that requires the physician to use the IDTF's services exclusively to provide diagnostic tests regardless of patient choice can ever fall within an exception.

## NO APPROVED PHYSICIAN SUPERVISORS FOR TESTS REQUIRING DIRECT SUPERVISION

179.   On information and belief, MDT NJ and MDT NY represented to Medicare and Medicaid that direct supervision of tests that required physician presence in the office suite or in the mobile unit would be performed by specific physicians whose credentials were presented to Medicare and Medicaid. As a general matter, however, those physicians did not actually perform the required direct supervision for MDT NJ and MDT NY.

180. For contrast media injections performed in mobile units, on information and belief, MDT NJ and MDT NY assigned no physicians to the mobile units as required.

181. Similarly, for stress tests performed in mobile units, on information and belief MDT NJ and MDT NY in general assigned no physicians to the mobile units. For other tests requiring direct supervision either no such supervision was provided or the physician supposedly providing the supervision was not disclosed to or approved by Medicare.

182. To the extent any supervision was provided, MDT NJ and MDT NY did not necessarily know who was providing it; it kept no schedule of coverage for such tests and its contracts with referring physicians did not require those specific physicians to perform the supervision, only that those physicians find someone to supervise, and the contracts did not require those physicians to disclose to MDT who they had found or what their qualifications were.

183. In order to ensure that patient health and safety is appropriately protected the regulations applicable to IDTFs require them to "maintain documentation of sufficient physician resources during all hours of operations to assure that the required physician supervision is furnished." 42 C.F.R. § 410.32(b)(2).

184. On information and belief, Defendants MDT NJ and MDT NY did not maintain such records.

{H0268483.1}                                    45

## STARK ACT

185.    The Ethics in Patient Referrals Act, also known as the Stark Act ("Stark"), generally prohibits a physician from making a referral under Medicare for designated health services to an entity with which the physician or a member of the physician's immediate family has a financial relationship. 42 U.S.C. §1395nn.

186.    Stark prohibits a physician from making referrals for certain designated health services payable by Medicare to the entity with which he or she or an immediate family member has a financial relationship such as ownership, investment or compensation, unless an exception applies.

187.    Stark prohibits the entity from presenting or causing to be presented claims to Medicare for those referred services. 42 U.S.C. §1395nn. 42 CFR §411.350-411.389.2.

188.    Stark applies to financial relationships between providers and the individuals or entities that provide tests or services.

189.    Stark and related statutory and regulatory limitations on financial interests in health care reimbursement impose legal constraints on certain types of health care arrangements among providers and entities making referrals for services and submitting health care claims to publicly funded Medicare and Medicaid programs.

190. The Patient Protection and Affordable Care Act ("PPACA") updated some sections of Stark, including in pertinent part, 42 U.S.C § 6003 which added new disclosure requirements to the in-office ancillary services exception.

191. The Stark Law's In-Office Ancillary Services Exception (IOASE) sets forth the exceptions that permit a physician in a solo or group practice to order and provide DHS in the office of the physician or practice group, provided that certain criteria are met.

192. Stark's In-Office Ancillary Services Exception ("IOASE") sets forth the exceptions that permit a physician in a solo or group practice to order and provide DHS in the office of the physician or practice group, provided that certain criteria are met.

193. Section 6003 of the PPACA changed the IOASE exception that impacts physician practices providing certain radiology services in their offices. Specifically, Section 6003 provides that, with respect to referrals for magnetic resonance imaging (MRI), computed tomography (CT), positron emission tomography (PET), and other advanced imaging services as determined, the referring physician must inform a patient in writing at the time of the referral that the patient may obtain the service from a person other than the referring physician or someone in the physician's group practice, and the referring physician must provide the patient with a list of suppliers who furnish the service in the area in which the patient resides.

{H0268483.1}                    47

194.    Effective January 1, 2011, CMS finalized the rule and it provides the

following:

    a.    Applies to MRI, CT, and PET services identified in the List of
          CPT/HCPCS Codes as "radiology and certain other imaging
          services."

    b.    Requires the referring physician to provide a written disclosure
          notice to his/her patient at the time of the referral. The disclosure
          notice must include a list of five other suppliers that provide the
          same services and are located within a 25-mile radius of the
          referring physician's office. At minimum, the disclosure notice
          must include the supplier's name, address and telephone number.
          If there are fewer than five suppliers within the 25-mile radius, the
          referring physician must list all of the suppliers. If there are no
          alternative suppliers within a 25-mile radius, a written list is not
          required.

    c.    Requires the disclosure notice to be written in a manner "sufficient
          to be reasonably understood" by all patients.

195.    On September 23, 2010, CMS published the Medicare self-referral

disclosure ("SRDP") protocol pursuant to the PPACA.

196.    The SRDP sets forth a process to assist providers of services and suppliers

to self-disclose actual or potential violation of the physician self-referral statute.

197.    Stark and its related regulations broadly prohibit a physician (or an

immediate family member of a physician) from referring a patient to an entity in which

he or she has a financial relationship for designated health services (DHS) payable by

Medicare or Medicaid.

198.    Stark defines DHS as:

a.      Clinical laboratory services;

b.      Physical therapy services;

c.      Occupational therapy services;

d.      Outpatient speech-language services;

e.      Radiology services, including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services;

f.      Radiation therapy services and supplies;

g.      Durable medical equipment and supplies;

h.      Parenteral and enteral nutrients, equipment, and supplies;

i.      Prosthetics, orthotics, and prosthetic devices and supplies;

j.      Home health services;

k.      Outpatient prescription drugs; and

l.      Inpatient and outpatient hospital services.

42 U.S.C. 1395nn(h)(6); 42 CFR 411.35.

199.   Stark defines a variety of prohibited financial relationships as

a.      An ownership or investment interest in the entity; or

b.      A compensation arrangement between the physician and the entity.

42 U.S.C. 1395nn(a)(2): 42 CFR 411.354.

200.   A prohibited financial relationship under Stark can arise from, inter alia, a direct or indirect relationship between the physician and an entity. By way of example,

a direct prohibited relationship exists, where a physician refers patients to a physical therapy business in which she owns stock. An example of an indirect financial relationship exists where a physician refers his patients to an imagining center and the physician is employed by a group practice which owns shares in the imaging center.

201. Stark provides key definitions including, "ownership or investment interest" as one created "through equity, debt or other means and includes an interest in an entity that holds an ownership or investment interest in any entity providing the designated health service." 42 U.S.C. 1395nn(a)(2); 42 CFR 411.354.

202. Stark further defines "compensation arrangement" in part as "any arrangement involving any remuneration between a physician (or immediate family member of the physician) and an entity." 42 U.S.C. 1395nn(h)(1)(A); 42 CFR 411.354(c).

203. "Remuneration" includes "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. 1395nn(h)(1)(B); 42 CFR 411.351.

204. Stark mandates self-reporting requirements on all businesses that bill Medicare and Medicaid. Upon request of the Centers for Medicare and Medicaid Services (CMS), or the OIG, a business must report its "ownership, investments and compensation arrangements" including covered services it provides and the names and physician identification numbers of all doctors with investment interests or

compensation agreements or with immediate family members with such interests. 42

CFR 411.361(c).

205. Stark sets forth numerous possible sanctions for violating the statue,

which are enforced by the federal government:

- a.    Potential denial of payment.

- b.    The government may require that the provider refund certain claims. CMS maintains that Stark mandates that, within 60 days of the prohibited referral, providers must refund to Medicare all amounts a provider collected from bills submitted in violation of Stark.

- c.    Doctors who bill for a service they know or should know is prohibited under Stark may face civil penalties of $15,000 for each service they wrongly billed and they may be excluded from the Medicare and Medicaid programs.

- d.    A physician or entity who enters into an arrangement or scheme which the physician or entity knows or should know has a principal purpose of assuring referrals by the physician to a particular entity is subject to civil penalties of up to$10,000 per day for each arrangement or scheme.

- e.    Anyone failing to meet a reporting requirement faces fines up to $10,000 for each day for which reporting is required to have been made.

206. Stark sets forth three areas of exceptions to prohibited referrals:

- a.    general exceptions;

- b.    exceptions related to ownership/investment interests; and

- c.    exceptions related to compensation arrangements.

*See* 42 CFR 431 Subpart J.

207.    Indirect Compensation Arrangements. This exception applies where:

a.    The compensation received by the referring physician (or immediate family member) is fair market value for services and items actually provided and does not take into account the volume or value of referrals or other business generated by the referring physician;

b.    The arrangement is in writing and specifies the covered services; and

c.    The compensation does not violate the AKS or any law or regulation governing billing or claims submission.

208.    Referral Services. This exception applies to remuneration which fits into the anti-kickback safe harbor as defined in 42 CFR §1001.952(f) for referral services.

209.    Stark regulations note that an arrangement permitted under Stark may still violate other laws including anti-kickback statutes and other federal and state laws prohibiting fraud and abuse.

210.    The public policies behind the anti-kickback statutes are to ensure that decisions of health care providers are not improperly influenced by a profit motive.

211.    The anti-kickback laws prohibit any individual or entity from knowingly and willfully soliciting, receiving, offering, or paying any form of remuneration ("in cash or in kind") in order to induce the referral of an individual for the furnishing or arranging for the furnishing of, any item or service payable under the Medicare or Medicaid programs. 42 U.S.C. 1320a-7b(b).

212.    Any physician referral arrangement that is subject to the Stark Law will also be subject to the AKS.

213.    The federal anti-kickback laws and regulations have established several "safe harbors" that are similar to but not necessarily identical to Stark's exceptions.

214.    Referral services. As used in section 1128B of the Act, "remuneration" does not include any payment or exchange of anything of value between an individual or entity ("participant") and another entity serving as a referral service ("referral service"), as long as all of the following four standards are met—

> a.     The referral service does not exclude as a participant in the referral service any individual or entity who meets the qualifications for participation.
>
> b.     Any payment the participant makes to the referral service is assessed equally against and collected equally from all participants, and is only based on the cost of operating the referral service, and not on the volume or value of any referrals to or business otherwise generated by either party for the referral service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.
>
> c.     The referral service imposes no requirements on the manner in which the participant provides services to a referred person, except that the referral service may require that the participant charge the person referred at the same rate as it charges other persons not referred by the referral service, or that these services be furnished free of charge or at reduced charge.
>
> d.     The referral service makes the following five disclosures to each person seeking a referral, with each such disclosure maintained by the referral service in a written record certifying such disclosure

and signed by either such person seeking a referral or by the individual making the disclosure on behalf of the referral service—

i. The manner in which it selects the group of participants in the referral service to which it could make a referral;

ii. Whether the participant has paid a fee to the referral service;

iii. The manner in which it selects a particular participant from this group for that person;

iv. The nature of the relationship between the referral service and the group of participants to whom it could make the referral; and

v. The nature of any restrictions that would exclude such an individual or entity from continuing as a participant.

215. On information and belief, it is alleged that Defendant MDTs pay referring physicians above market "rental fees" for the use of their offices for performing mobile diagnostic testing, as an inducement for the physicians to order diagnostic testing. It is further alleged much of this diagnostic testing was unnecessary. During his tenure with Defendants MDT NJ, MDT NY and MDT CA, Relator observed that the Defendant physicians ordered unnecessary tests, and Defendants MDT NJ, MDT NY, MDT PA, MDT CA, ALPHA SCAN, VIJAY PATEL, DIPEN V. PATEL, HIMESH V. PATEL and ALKA V. PATEL performed the unnecessary testing and submitted false claims for the reports related to the radiology tests.

{H0268483.1}                                54

### *Protocol Testing*

216.   In email correspondence to Relator dated October 11, 2011, Defendant

DIPEN PATEL informed Relator:

> 1) MDT's New Jersey location "**Each patient we do studies
>    on gets a min of 3 studies, Arterial, Venous, Carotid) so
>    we are doing volume**."
> 2) MDT's New York site "Billing is tricky…."
> 3) MDT's California location "**I have physicians lined up
>    who are referring patients for a full work-up so I will be
>    doing a min of 3studies as well**."

(Emphasis added)

217.   Relator received through RMC's eRAD PACs information revealing that

the patients were in fact subjected to protocol testing:

    A.    MDT NJ

Consistent with MDTs' representations made through Defendant DIPEN

PATEL, MDTs from at least on or about February 2012 to on or about April 2014,

referring physicians to MDT NJ, including Defendants RAOUF, RAO, DASSANI,

BIENSTOCK, KRICKO, KOLLI, RASHID, BRABSTON, THIRUMAVALAVAN,

CODELLA,    REICH-SOBEL,    LOSOS,    SIDALI,    STACK,    LENTINE,

KOENINGSBERG, SCHULMAN, KALRA and GREENSPAN, engaged in protocol

test ordering whereby each referring physician typically ordered  a minimum of three

tests per patient as reflected in **Exhibit 1**[1] and incorporated herein.

### B.     MDT CA

Consistent with MDTs' representations made through Defendant DIPEN PATEL, MDT CA's referring physicians from at least on or about January 2013 to on or about September 2013 engaged in protocol test ordering whereby each referring physician typically ordered a minimum of three tests per patient as reflected in **Exhibit 2** and incorporated herein.

### C.     ALPHA SCAN

Defendant MDT NJ continued to perform readings for protocol ordered exams for Defendant ALPHA SCAN, a company that was used to illegally perform billings for MDT NJ from on or about February 2013 to on or about August 2013. Defendant ALPHA SCAN's referring physicians engaged in protocol test ordering whereby each referring physician typically ordered a minimum of three tests per patient as reflected in **Exhibit 3** and incorporated herein.

### D.     Protocol Ordering of Tests for Husbands and Wives

During his tenure with Defendant MDTs, Relator observed in authoring reports that Defendant doctors RASHID, CODELLA, KRICKO, SOBEL, LOSOS and SIDALI from in or about September 2013 to on or about April 2014 ordered the same tests for husbands and wives on the same date as reflected in **Exhibit 4** and

---

[1] Exhibits 1 -5 are redacted to comply with HIPAA.

incorporated herein.

      E.      Protocol Ordering of Transcranial Doppler Tests

Relator maintains that all of the Transcranial Doppler Ultrasound (TCD) studies that Defendant MDTs performed from on or about August 2013 to on or about March 31, 2014, were medically unnecessary and constitute false claims as reflected in **Exhibit 5** and incorporated herein.

218.  Relator's review of the TCD studies was always normal, and there were essentially no appropriate clinical indications for the ordering of TCD studies. **(Exhibit 5)**

219.  To the best of Relator's knowledge, all TCD studies that Defendant MDTs ordered were done on a routine basis, as part of a general screening study for patients displaying no symptoms.

220.  A TCD study is a specific ultrasound examination, used for a defined set of clinical indications.

221.  Defendants MDTs' use of TCD studies as a routine screening test on asymptomatic patients were medically unnecessary.

222.  According to the American College of Radiology (ACR), specific indications for TCD may include:

      A.      Follow-up of known stenosis or occlusion of a major intracranial artery or the Circle of Willis.

      B.      Monitoring thrombolytic therapy in an acute stroke

patient.

C.   Monitoring of vasospasm in patients with prior subarachnoid hemorrhage.

D.   As an adjunct to confirmation of clinical brain death.

E.   Evaluation of Sickle Cell Disease on intracranial blood flow.

F.   Assessment of arteriovenous malformations of the brain.

G.   Follow-up of intracranial aneurysms.

http://www.acr.org/~/media/e9b9f42fdbd4411aa159f4af657f774b.pdf

http://www.aium.org/resources/guidelines/transcranial.pdf

## COUNT I
## False Claims Act - Presentation of False Claims

223.   Relator incorporates by reference paragraphs 1-222 inclusive of this Complaint.

224.   In performing the acts described above, Defendants, acting in concert and/or through their own acts or through the acts of their officers and agents knowingly and/or recklessly presented or caused to be presented false or fraudulent claims for payment or approval for payment by government funds in violation of 31 U.S.C. § 3729(a)(1)(A).

225.   The United States was unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## COUNT II
## False Claims Act - False Statements

226.   Relator incorporates by reference paragraphs 1-225 inclusive of this Complaint.

227.   In performing the acts described above, Defendants acting in concert and/or through their own acts or through the acts of their officers, knowingly made, used or caused to be made or used, a false record of statement to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. §3729(a)(1)(B).

228.   The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT III
## THE NEW JERSEY FALSE CLAIMS ACT (NJFCA)

229.   Relator incorporates by reference paragraphs 1-228 inclusive of this Complaint.

230.   The NJFCA states that:

A person shall be jointly and severally liable to the State for a civil penalty of not less than and not more than the civil penalty allowed under the federal FCA (31U.S.C. § 3729 et seq.), as may be adjusted in accordance with the inflation adjustment procedures prescribed in the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, for each false or fraudulent claim, plus three times the amount of damages which the State sustains, if the person commits any of the following acts:

(a)     Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c)     Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

(d)     Has possession, custody, or control of public property or money used or to be used by the State and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

(e)     Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the entity, makes or delivers a receipt without completely knowing that the information on the receipt is true;

(f)     Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property; or

(g)     Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

N.J. Stat. Ann. § 2A:32C-3.

231.   In performing the acts described above, Defendants acting in concert

and/or through their own actions or through the acts of their officers and/or agents,

knowingly presented, or caused to be presented, to an officer or employee of the State

{H0268483.1}                           60

of New Jersey, a false claim under the New Jersey False Claims Act in violation of N.J. Stat. Ann. § 2A:32C-3.

232.    The State of New Jersey, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT IV
## NEW YORK FALSE CLAIMS ACT (NYFCA)

233.    Relator incorporates by reference paragraphs 1-232 inclusive of this Complaint.

234.    The NYFCA, states in part the following:

Liability for certain acts.

(1)    Subject to the provisions of subdivision two of this section, any person who:

    (a)    knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

    (b)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    (c)    conspires to commit a violation of paragraph (a), (b), (d), (e), (f) or (g) of this subdivision;

    (d)    has possession, custody, or control of property or money used, or to be used, by the state or a local government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(e)    is authorized to make or deliver a document certifying receipt of property used, or to be used, by the state or a local government and, intending to defraud the state or a local government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(f)    knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state or a local government knowing that the officer or employee violates a provision of law when selling or pledging such property; or

(g)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government shall be liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person.

N.Y. Stat. § 189.

235. In performing the acts described above, Defendants acting in concert and/or through their own actions or through the acts of their officers and/or agents violated N.Y. Stat. § 189.

236. The State of New York, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT V
## CALIFORNIA FALSE CLAIMS ACT (CFCA)

237.  Relator incorporates by reference paragraphs 1-236 inclusive of this

Complaint.

238.  The CFCA specifically provides, in part:

(a)  Any person who commits any of the following enumerated acts in this subdivision shall have violated this article and shall be liable to the State or to the political subdivision for three times the amount of damages that the State or political subdivision sustains because of the act of that person. A person who commits any of the following enumerated acts shall also be liable to the State or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and shall be liable to the State or political subdivision for a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) for each violation:

(1)  Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2)  Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

(3)  Conspires to commit a violation of this subdivision.

(4)  Has possession, custody, or control of public property or money used or to be used by the State or by any political subdivision and knowingly delivers or causes to be delivered less than all of that property.

(5)  Is authorized to make or deliver a document certifying receipt of property used or to be used by the State or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used.

(6)     Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property.

(7)     Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the State or to any political subdivision, or knowingly conceals, or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.

(8)     Is a beneficiary of an inadvertent submission of a false claim subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State or the political subdivision within a reasonable time after discovery of the false claim.

Cal. Gov't Code § 12651(a).

239.   In performing the acts described above, Defendants acting in concert and/or through their own actions or through the acts of their officers and/or agents violated Cal. Gov't Code § 12651(a).

240.   The State of California, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## PRAYER FOR RELIEF

WHEREFORE, Relator on behalf of himself and of the United States and the States of New Jersey, New York and California request judgment as follows:

A.     The United States and the States of New Jersey, New York and California are entitled to reimbursement of the funds plus 3 times the damages sustained by the

United States as a result of the false or fraudulent claim obtained by Defendants as a result of fraudulent claims submitted to the United States, and the States of New Jersey, New York and California.

B.       The United States is entitled to a civil penalty of \$5,500 to \$11,000, adjusted for inflation for each false or fraudulent claim.

C.       The United States is entitled to a civil monetary penalty of \$10,000 to \$50,000 for each violation of the CMPL.

D.       The United States is entitled to exclude Defendants from participation in any federal health care program. *See* 42 U.S. C. § 1320a-7(b)(7).

E.       The States of New Jersey, New York and California are entitled to civil penalties pursuant to their respective false claims acts.

F.       Relator is entitled to reasonable attorneys' fees and costs. *See* 31 U.S.C. § 3730(d).

G.       Relator is entitled to an order of partial distribution of damages, penalties, assessments, and other relief awarded to the United States in an amount equivalent to a percentage of the entire recovery as set forth in 31 U.S. C. § 3730(d) and the State False Claims Acts for New Jersey, New York and California; such percentage distribution is in addition to Relator's recovery of expenses, attorneys' fees, and costs.

## **DEMAND FOR TRIAL BY JURY**

NOW COMES Relator, Richard Chesbrough, on behalf of himself, the United

{H0268483.1}                                                 65

States of America and the States of New Jersey, New York and California, by and through

his attorneys, HERTZ SCHRAM PC, WARREN | BENSON LAW GROUP and

MUELLER LAW LLC, and hereby demands a jury trial in the above-captioned matter.

Respectfully submitted,

By: _____

William L. Hurlock, Esq.
MUELLER LAW LLC
363 Bloomfield Avenue
Suite 2-C
Montclair, New Jersey 07042
(973) 233-8290
*Local Counsel for Plaintiff-Relator*

Patricia A. Stamler
HERTZ SCHRAM PC
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302-0183
(248) 335-5000
*Co-Lead Counsel for Plaintiff-Relator*

Donald R. Warren
WARREN BENSON LAW GROUP
7825 Fay Avenue, Suite 200
La Jolla, CA 92037
(858) 454-2877
*Co-Counsel for Plaintiff-Relator*